## Daub's Estate.

Argued October 10, 1933. Before SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*John G. Frazer,* with him *John C. Bane, Jr.,* and *Reed, Smith, Shaw & McClay,* for appellant.

*John Rebman, Jr.,* for appellee.

OPINION BY MR. JUSTICE SIMPSON, November 27, 1933:
In this case we have been favored with elaborate briefs and an extensive printed record, but the controlling points are few and compel a reversal of the decree.

Charles Daub (the testator), August Daub and Jacob Daub were brothers and had been partners for some forty years. Their partnership articles provided: "It is hereby also agreed and understood between the parties hereto, that in order to avoid any and all controversies or disputes which might arise *in case of the death of one or more of the said partners,* as to settlement of his or their share or shares and interests in the partnership, and in order to facilitate the ascertainment of the interest of each in the partnership assets, the parties hereto fix as the fair value of the entire partnership estate the sum of $420,000.00, and after carefully considering what would be a fair and proper division thereof as between the partners, taking into consideration the value of the services rendered and the moneys first invested in the

business, a perfectly fair division thereof is hereby mutually agreed upon to be as follows:

"Said Charles C. Daub is, and shall be entitled to one-half thereof, or the sum of $210,000.00;

"Said Jacob Daub is, and shall be entitled to one-fourth thereof, or the sum of $105,000.00;

"Said August Daub is, and shall be entitled to one-fourth thereof, or the sum of $105,000.00.

"This estimate and valuation of the partnership estate shall be accepted as the correct amount payable *at the death of either* of the partners to the estate of the one so dying, *regardless of any appreciation or depreciation in the assets in the future or of any or all losses,* and is as follows: to-wit: To the estate of Charles C. Daub, $210,000; to the estate of Jacob Daub, $105,000, and to the estate of August Daub, $105,000."

Jacob died first and his estate received the $105,000 out of the partnership funds, and thereafter, subject to the provisions of the partnership agreement, if it continued to be applicable, Charles had a two-thirds, and August a one-third interest in the firm. Whether or not Jacob's death would have ended the partnership agreement, if its language alone were to be considered, is a disputed question we are not required to answer, though the above quoted extract would seem to imply that it did not. The business was, in fact, continued by Charles and August just as before, and Charles repeatedly said it was so carried on in accordance with the agreement, and, so far as appears, August assented to that conclusion. This constituted an interpretation of the ambiguous language of the agreement by the parties to it, and an interpretation thus reached in a controversy, as here, between the partners and those claiming under them, will always be enforced by the courts: Gillespie v. Iseman, 210 Pa. 1; Fisher v. Ronemus, 267 Pa. 325, 330; Baeder, Adamson Co. v. Tunnell & Co., Inc., 285 Pa. 356, 361. We therefore hold that the terms of the partner-

ship agreement were binding on Charles and August after the death of Jacob.

When Charles died, August and Jacob were named in his will as executors thereof, but, Jacob being dead, letters testamentary were granted to August only. When the question arose as to what sum Charles's estate was entitled to receive from the partnership, August, as executor, consulted the counsel who had drawn both the partnership agreement and Charles's will which referred to it, and who for many years had represented not only the firm, but also each of the partners individually. He was a lawyer of unquestioned integrity and ability. He advised that the partnership agreement was in force, and that Charles's estate was entitled to receive only the sum of $210,000. A two-thirds interest in the partnership assets was worth in excess of that sum; but this, as the partnership agreement showed, was (it being still in force) a matter of no moment. August told the distributees under Charles's will what the lawyer had advised and showed them the partnership agreement. When he filed his account he charged himself, quoad the partnership assets, with the sum of $210,000 only. At that time, as we pointed out in our former opinion herein (Daub's Est., 305 Pa. 446, 452) : "She [Charles's widow] admitted that, after her election, and during the executor's lifetime, she had never asked the executor or anybody else for information regarding the estate, but persisted in the contention that this was because of her great and continued confidence in him. Yet it was clearly proved, and is practically admitted even by her, that, about one year after the death of her husband and about five years before the petition was filed, she had had a controversy with the executor regarding a matter growing out of her interest in the estate, and that thereafter neither visited the other, though they lived but half a block apart, and their previous friendly relations had dwindled to a bowing acquaintance when they chanced to meet." Nevertheless, at the audit, with full knowl-

edge of what had been done, she and the other distributees agreed in writing to the confirmation of the account; this agreement and the partnership articles also were handed up to the auditing judge (who of course knew from those articles whether or not the $210,000 was a proper amount) ; he confirmed the account and made a final decree of distribution on December 26, 1923.

So far as appears, none of the parties in interest made any objection to the decree of distribution or any of the proceedings, either then or subsequently, until after August Daub, the executor, died on September 4, 1926. On April 24, 1929, then for the first time complaining, they filed the petition which initiated the present proceedings, asking that the decree confirming the first and final account be opened, and that the executors of August be directed to file a supplementary account in the estate of Charles. A citation was issued as prayed for, the account was opened, and after a long and tedious proceeding the estate of August was surcharged, on the theory that the partnership agreement ceased to have any validity after Jacob died. As we have shown, this was an erroneous conclusion. August's surviving executor then took the present appeal.

The Fiduciaries Act of June 7, 1917, P. L. 447, which defines "fiduciary" in section 1 (page 457) to "include executors, administrators, guardians and trustees," provides in section 48 (page 514) : "Within five years after the final decree confirming the original or supplementary account of any fiduciary, which has been or may be hereafter passed upon, a petition of review being presented by such fiduciary or his legal representatives, or by any person interested therein, alleging errors in such account, or in any adjudication of the orphans' court, or any report of an auditor of such account, which errors shall be specifically set forth in said petition of review, said petition and errors being verified by oath or affirmation, the orphans' court shall grant a rehearing of so much of said account, adjudication, or auditor's report

as is alleged to be error in said petition of review, and give such relief as equity and justice may require, by reference to auditors, or otherwise, with like right of appeal to the proper appellate court as in other cases." We decided in Stetson's Est., 305 Pa. 62, that the limitation of five years specified in that section is all inclusive, except in cases of fraud. Appellees attempt to maintain the singular doctrine that, if they allege fraud in their petition, the decree must be opened whether or not there was fraud in fact. That theory, which is an invitation to careless swearing, would establish the conclusion that even a delay of fifty years or more would be no bar. We said, however, that the supposed fraud must be alleged and proved (305 Pa. 68). Of course, the court below made no such mistake as that of appellees. On the contrary, it said: "It is further averred [by appellants] that Mr. Robertson [the counsel referred to] advised August Daub [the executor of Charles] that the payment of $210,000 would exonerate him. *We have no intention to impute actual fraud to August Daub.* After assuming administration, August Daub made a mistake by not telling his sister-in-law and his nieces and nephew all of the financial affairs of his brother Charles. *We do not doubt that he was advised by Mr. Robertson [who himself so testified] that the payment of $210,000 to himself as executor would be an acquittance,* but no matter whether he was advised by counsel or not, constructively he committed a fraud and the mistake of his counsel is not ratio suaseria for not paying."

This extract from the opinion of the court below erroneously assumes that August had a duty to pay in excess of the $210,000, and that he concealed the facts as to the value of the partnership assets, yet neither assumption is true in fact. As we have already shown, Charles's estate was entitled to the $210,000, and that only. Upon payment of that sum, the distributees under his will had no interest in the partnership assets, and no right to know of what they consisted, certainly not unless they

asked to be advised on the subject, and this they never did. That being so, the fact that August did not volunteer information to those not asking for it, did not make him guilty of constructive or any other kind of fraud. When he was appointed executor he did what every other sensible man in such a position would have done. He laid the matter before the capable lawyer who had for years represented all the parties in interest in the firm, including Charles, as well as the firm itself, and then told appellees of the advice received and showed them the partnership agreement. True, he did not tell them what the assets of the partnership were, for, under that advice, as we have said, appellees had no interest therein, and were not entitled to know, certainly not unless they asked for the information, and apparently they were satisfied, since they asked no question. Under such circumstances constructive fraud cannot properly be charged. In the prior proceeding in this estate (305 Pa. 446), where the widow, appellee, sought to have her written agreement to take under her husband's will set aside, we said at page 452: "The basis of the decision of the court below was that, 'whether or not the executor believed that the partnership agreement was in force at the death of the testator, his failure to disclose full information to the widow concerning her husband's estate, was ......a constructive fraud on her, and laches should not be attributed to her in not filing a petition within the time usually required.' We are not told why the court below so thought, and cannot agree with its conclusion. That the executor believed the partnership agreement applied to the status which existed after testator's death, is as free from doubt as anything human can be; and that all the other parties in interest likewise so believed at that time is an admitted fact. We do not qualify our oft-repeated decisions that a widow is entitled to full information regarding her deceased husband's estate before she can be called upon to make her election, but that principle does not control here."

42

We reaffirm that conclusion, but it does not affect the present proceeding, since, as we have shown, the interest of testator's estate in the partnership assets was limited to the $210,000 which was paid and accounted for. In the prior proceeding, the widow was refused the right to set aside her election, and for a like reason she and her children must be refused the right to overturn the decree of confirmation of the account, to which she and they expressly agreed, especially as they did not proceed until after the death of the executor, who could best answer their complaints. We said in that case (305 Pa. 454): "A different conclusion will of course be reached in cases where actual fraud has been committed to obtain the widow's election [or the confirmation of the executor's' account], and no laches appears, for fraud vitiates everything it touches." As we have already pointed out, however, it is found as a fact that there was no actual fraud on the part of August, the executor. The supposed constructive fraud there urged is exactly the same as that urged here; there it was unavailing, and here it must be also. So, too, as we have shown, both there and here there was gross laches on the part of appellees, which the death of August made irretrievable.

The decree of the court below is reversed, and its order opening the decree confirming the first and final account of the executor and all proceedings following that opening are vacated and set aside at the cost of appellees.